UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF TROY, IDAHO,<br><br>Defendant. | Civil Action No.<br><br>**COMPLAINT** |

The United States of America alleges as follows:

**INTRODUCTION**

1. The United States brings this civil action for declaratory and injunctive relief against the City of Troy, Idaho ("the City," "Troy" or "Defendant") for violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5. The City violated RLUIPA when it enforced the zoning provisions of the City's Code ("City Code" or "the Code"), Troy, Idaho, Code of Ordinances, § 1-4 (2021), to deny an application for a conditional use permit ("CUP") that would have allowed Christ Church to operate a religious assembly in a business district in downtown Troy.

2. The City's enforcement of the Code and its actions in denying the CUP application violated RLUIPA because the City: (1) treated a religious assembly or institution on terms less than equal to those applied to nonreligious assemblies or institutions, 42 U.S.C. § 2000cc(b)(1); (2) imposed an unjustified substantial burden on the exercise of religion, *id.* § 2000cc(a); and (3) discriminated on the basis of religion or religious denomination, *id.* § 2000cc(b)(2), in violation of RLUIPA.

**JURISDICTION AND VENUE**

3. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 2000cc-2(f).

4. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to this action occurred in the District of Idaho.

**PARTIES**

5. The United States has the authority to bring this action under 42 U.S.C. § 2000cc-2(f).

6. Defendant Troy is a municipality in Latah County, Idaho, and is governed by a City Council, which includes the Mayor and four Councilpersons. The City's leadership is elected, with vacancies on the Council filled by appointment of the Mayor and consent of the Council. The Mayor presides over Council meetings and votes only when the Council is equally divided.

7. The City Council acts as the planning and zoning commission for Troy. In this capacity, it is responsible for making recommendations about zoning changes, enacting and revising the zoning laws, and hearing and deciding applications for conditional use permits.

8. Troy is a "government" as defined by RLUIPA, 42 U.S.C. § 2000cc-5(4)(A)(i).

**FACTS**

**Christ Church**

9. Christ Church is an evangelical church located in Moscow, Idaho.

10. Christ Church constitutes a "religious assembly or institution," under RLUIPA. 42 U.S.C. § 2000cc(2)(b)(l).

11. The church has a fast-growing congregation and has sought to accommodate this growth by holding services at additional locations in the area. At present, Christ Church's

congregation is too large to hold services at any one location, and the church has had to establish several new locations for services in Moscow. As part of this expansion effort, Christ Church sought to find an appropriate facility for Sunday services in Troy, which is a close neighbor to Moscow. Historically, congregants residing in Troy have commuted from Troy to Moscow to attend the church's services, but desire to have worship services in Troy.

12. Beginning in September 2022, Christ Church rented a local bar in downtown Troy for Sunday morning services. The congregants set up folding chairs in the bar and held services twice without incident. At that time, there were approximately 60 members of Christ Church residing in Troy.

13. On October 5, 2022, the City's attorney sent a notice of violation and cease-and-desist order to the bar's owner. The order directed the owner to discontinue use of the bar as a church on the grounds that a conditional use permit was required for a church to operate in the commercial zoning district of downtown Troy.

14. At this time and throughout the entirety of the church's ensuing dealings with the City, Christ Church made a substantial effort to find a suitable location for its Sunday services. On various occasions, the church reached out to other facilities in Troy to explore renting space for Sunday services, including a local public school, but those requests were rebuffed. The church also considered building a facility outside of town, but did not have enough capital for such a project.

15. In November 2022, Matt Meyer, a parish elder associated with Christ Church, purchased a former bank building ("Subject Property") at 424 S. Main Street in the downtown business district of Troy.

16. Free parking near the Subject Property is available on both sides of S. Main Street and on the adjacent neighborhood streets.

17. The Subject Property had been vacant for approximately one year prior to Meyer's purchase.

18. Meyer planned to convert half of the property into office space and half into an event center, which could be used by Christ Church for Sunday morning worship and occasional church meetings.

19. On January 24, 2023, Christ Church entered into a lease to rent the Subject Property. The lease states that Christ Church would have access to the building by right every Sunday and could coordinate with the landlord on using the building during the week, as the "facility will also be open for rental by other parties provided that there is no conflict with [Christ Church]."

20. Meyer and Christ Church have a "property interest" in the Subject Property within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(5).

21. Meyer's and Christ Church's efforts to establish a place of worship at the Subject Property constitutes "religious exercise" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(7).

### Troy's City Code and Comprehensive Plan

22. The Subject Property is located in the C-1 zoning district of Troy.

23. Troy's City Code establishes eight zoning districts that apply to and govern the use, maintenance or development of all land in the city. The districts are as follows: R-1 (Single-Family Residential); R-2 (Two-Family Residential); R-3 (Multiple-Family Residential); R-M (Residential Manufactured Home or Mobile Home); C-1 (Central Business); C-2 (Highway Commercial); IND (Industrial); and INAG (Industrial/Agricultural).

24. For each district, the City Code designates which land uses are permitted as of right and which are permitted only upon the issuance of a conditional use permit. Those determinations

are listed in a Schedule of District Land Use Controls, with "P" designating a permitted use and "C" designating a conditional use.

25. At the time Meyer and Christ Church sought a CUP from the City and until approximately April 2025, pursuant to the Code, a "church or religious facility" was a "conditional use" in every zoning district in the City, including C-1 (Central Business). Religious facilities are not permitted by right in any zoning district.

26. Section 9-12 of the City Code governs conditional use permits. To obtain a CUP, an application and nonrefundable fee must be submitted to the City Council, which must then hold a public hearing and solicit public comment.

27. Troy's Code identifies several subjective criteria that must be satisfied for a CUP to be granted, including whether the proposal: (1) is compatible with the surrounding neighborhood; (2) provides a convenient and functional living, working, shopping, or civic environment; (3) is as attractive as the nature of the use and its location and setting warrants; and (4) enhances the successful operation of the surrounding area in its basic community functions, or provides an essential service to the community or region.

28. The Code permits the City Council to grant a CUP and impose conditions on the property and use of the property as the Council deems necessary.

29. In contrast to conditional uses, permitted uses are uses as of right and, therefore, not subject to the same application and approval process, evaluative criteria, or potential conditions on the property.

30. The stated purpose of C-1, the Central Business District, is to "preserve and enhance the downtown business sector along a turn of the century theme" and to "provide general retail shopping needs to the community." City Code § 9-6A-1. "The building uses in the central

business district reflect the desire to have parking provided on a district basis rather than having each individual building or use provide parking." *Id*.

31. At the time Meyer and Christ Church sought a CUP from the City and until approximately April 2025, numerous non-religious assembly uses were allowed in C-1 as "permitted uses," including but not limited to, auditoriums, community centers, parks, playgrounds, civic and fraternal organizations, labor unions, schools, museums, art galleries, libraries, and movie theaters. Further, single family homes were permitted in the C-1 district. City Code § 9-9-2.

32. Non-religious assembly uses, such as civic, social, and fraternal organization are also permitted, as of right, in other zoning districts including the R-3, and C-2 zoning districts. Community centers are also permitted as of right in the R-M and C-2 zoning districts, while libraries and museums are also permitted as of right in the C-2 zoning district.

33. Below is a use chart, derived from City Code § 9-9-2, reflecting some of the permitted uses and those allowed as conditional uses in the City's zoning districts at the time Meyer and Christ Church sought a CUP from the City and until approximately April 2025. A "P" denotes a permitted use; a "C" denotes a conditional use. A blank space connotes that the use is not allowed in that district.

|  | R-1 | R-2 | R-3 | R-M | C-1 | C-2 | IND | INAG |
|---|---|---|---|---|---|---|---|---|
| Art gallery |  |  |  |  | P | P |  |  |
| Auditorium |  |  |  |  | P | P |  |  |
| Civic, social and fraternal organization |  |  | P |  | P | P |  |  |
| Community Center |  | C | C | P | P | P |  |  |
| Labor union organization |  |  |  |  | P | P | P |  |
| Library |  | C | C |  | P | P |  |  |
| Theater, movie (indoor) |  |  |  |  | P | P |  |  |
| Musuem or planetarium |  |  |  |  | P | P |  |  |
| Park, playground or open space | P | P | P | P | P | P | P | P |
| Schools, academic/vocational (commercial and public/nonprofit) | C | C | C | C | P | P | P | C |
| Church or religious facility | C | C | C | C | C | C | C | C |
| Dwelling, single-family | P | P | P |  | P | P |  |  |

34. At present, the Lions Club, Troy Historical Society, and Troy Community Library are all located in the C-1 district on S. Main Street. Each also has its own page or information about it listed on the City's website.

35. The City's website also recognizes four churches in town: The Church of Jesus Christ of Latter-day Saints; Troy Lutheran Church; Troy Seventh-Day Adventist Church; and Troy Church of the Nazarene. At least one of these churches—Troy Lutheran Church—is located in the C-1 district.

36. In April 2025, after being notified that it was under investigation by the United States for potential violations of RLUIPA, Troy enacted Ordinance No. 2025-02, which changed many of the uses allowed in the C-1 district from "permitted" to "not permitted," including auditoriums, community centers, civic and fraternal organizations, parks, playgrounds, schools, museums, libraries, and movie theaters. Ordinance No. 2025-02 also prohibited churches as a conditional use in the C-1 district.

37. Art galleries continue to be permitted as of right in the C-1 district.

38. Indoor entertainment and amusement uses continue to be allowed as a conditional use in the C-1 district.

39. Troy also has a comprehensive plan ("Comprehensive Plan") for purposes of local land use planning, which functions as a nonbinding guide for development decisions.

40. Troy's City Code and Comprehensive Plan are a "land use regulation" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(5).

### CUP Application

41. On November 21, 2022, Meyer submitted a CUP application for the Subject Property to the City.

42. The application indicated that the property would be used for a range of uses, including "social and fraternal organization meetings; Community Center events; Health club or dance classes; business/professional office space; and a meeting place for a church." Meyer sought a CUP "to allow the building to be rented to a religious organization for religious meetings." The application explained that the religious services would occur "almost exclusively" on Sunday mornings with approximately 80 people anticipated to attend, and that those needing parking would rely on public street parking, which is freely available on S. Main Street and surrounding streets.

43. The CUP application form requires applicants to show that the proposed use is justified based on its compliance with certain criteria. Those criteria include: the existence of special circumstances that are peculiar to the property (size, shape, or location) and that are not the result of the applicant's actions; undue hardship absent permission from the City; no conference of special privileges; and no conflict with public interest or injury to surrounding persons or

property.

44. Meyer's application addressed all listed criteria and provided the requested justification.

45. In his application, Meyer emphasized the following observations:

   a. "The only other meeting space of any size in Troy is the Lions' Club. However, this facility is NOT available for rent for political or religious meetings. Therefore, there is a need for a sizable meeting space downtown that accommodates these purposes. And while two other churches (Lutheran and Nazarene) are located in or near the commercially zoned area of Troy, these are not available for rent on Sundays."

   b. "The use of this facility on Sundays when the town is quiet and the downtown is unoccupied presents no or comparatively little impact on the city versus during the times when by-right uses are anticipated."

   c. "The property owner is taking ownership of a building that has been vacant for almost a year. The purchase of this building will represent ongoing property tax revenue to the city and added downtown business activity."

   d. "The building is built with concrete block and brick. It is practically soundproof."

   e. "As noted, the streets in Troy are practically empty on Sundays, so parking can't be an issue. No equipment or goods are being delivered, only people walking to and from the entrance are anticipated. The size of the meeting space is sufficient for those attending to stay indoors (particularly during the winter) so interference of sidewalk traffic or kids getting into the street is not

anticipated."

46. On January 25, 2023, the City Council held a public hearing on the CUP Application. The Mayor and three of the four Councilmembers were in attendance.

47. Meyer spoke first and explained why the CUP was justified based on the applicable criteria.

48. The City's Maintenance Supervisor read from a report that had "made an investigation of facts necessary to provide information to ensure a decision consistent with the intent and criteria of [the Code]." The report did not make a final recommendation on the application.

49. At the public hearing, 19 citizens personally appeared to express their views, with one speaking in favor of, one neutral to, and 17 against granting the CUP.

50. Many of views expressed at the hearing reflected animus against Christ Church's beliefs or its members, including that the Church was proposing an "evangelical community" that was not "open to everyone."

51. Another objector claimed to have had "bad experiences with people involved" in the Church.

52. One objector declared that Troy would become a "ghost town because of this organization's ethos and dogma."

53. Another objector stated: "We need a community center, a place to bring it together instead of tear it apart. Downtown is not the place for another church, especially one that is so divided and has not had successful businesses downtown."

54. A fourth objector stated: "We don't need another church—especially this church—downtown."

55. Each of these comments was met with enthusiastic applause by the audience.

56. The City also received and considered 32 written comments regarding the CUP application that were submitted by residents. Of the written submissions, 26 commenters opposed the CUP and six supported it.

57. Many of the written comments spoke negatively about Christ Church and its members' beliefs, practices, and conduct. Several repeated allegations or rumors implicating the reputation of Christ Church. Among the comments were the following:

   a. "I do not want Christ Church to be allowed to destroy another Idaho town. They are evil people spreading evil beliefs."

   b. "I would advise against the building of this church establishment. Extreme views."

   c. "As a community, we do not need a hate group in our town."

   d. "Christ Church has been nothing but destructive and hurtful to the people and businesses of Moscow, Idaho. Their war on empathy, attacks on human rights, and grotesque terminology and actions towards anyone who does not align with their extremist values shows they are little more than a hate group committed to disrupting communities."

   e. "Mr. Meyer fails to address how Christ Church's controversial antics and spiritual warfare will positively impact the local community. We know that the following facts will not help improve the community and will endanger the mental and physical well-being of Troy residence [sic]: One or more Christ Church elders have threatened physical harm to Troy residents over disagreements. Christ Church has institutions that have condoned sexual and

       physical assault against children. . . . Christ Church families have been told not to go to the police to report sexual and domestic violent crimes. . . . We strongly believe that Christ Church's controversial pursuits for Christian Nationalism and goals to physically take over Downtown Troy are not good for the Troy community."

    f.  "While I have no issues with religious communities in general, the organization attempting to claim this space is one I disagree with WHOLEHEARTEDLY. . . . Between misogynistic ideology, shady business practices, and reports of marital assault being brushed under the rug by higher ups, I see no reason to allow this permit to move forward."

58.    These comments reflect a longstanding tension between Christ Church and some members of the community.

59.    The church has previously received negative press coverage, leading to harassment and heckling of its members and those perceived to be affiliated with it in the community.

60.    Posts made on a Troy community Facebook page during this period also reflect public hostility to the church. For instance, one resident posted in the months preceding the hearing that the church should "go away and leave our town alone" and asked why the church doesn't "listen to all the community members . . .that clearly state [the church's] version of Christians are not welcome."

61.    After hearing from the public and providing Meyer with an opportunity to respond, the City Council closed the public hearing and took the matter under advisement.

### Denial of the CUP Application

62.    On March 8, 2023, City Council discussed the CUP application and voted

unanimously to deny it.

63. On March 29, 2023, the City Council issued a written decision denying the CUP. This written decision was presented at the Council's meeting.

64. The written decision stated that the church "did not enhance the commercial district" and that the religious use was "not in harmony with the Comprehensive Plan."

65. The City also held that "the uses Mr. Meyer proposed for the building *other than* for a church are uses which are allowed within this zone and enhance the commercial district of the City." (emphasis in original).

66. The City Council's decision did not explain how such uses (i.e. civic, social and fraternal organization meetings; community center events; health club or dance classes; and professional office space)—which are generally unrelated to retail shopping and commercial needs—enhance the commercial district.

67. Neither did it explain how single-family homes—then permitted by right in the C-1 district—enhance the commercial district, while religious uses would not.

68. It also did not explain how allowing one religious use among many other uses in the building would detract from the commercial district.

69. Finally, it did not address the factors from the Comprehensive Plan that would have weighed in favor of granting the application, such as the City's "wish[] to ensure that land use policies . . . [do not] create unnecessary technical limitations upon the use of [private] property," "avoid regulations or actions which would significantly impact an owner's economic use of the property," and "avoid over-zoning."

70. The City Council's decision found that granting the CUP would place an "undue imposition" on nearby residents and businesses due to "parking and traffic," despite, by the City

Council's admission, not conducting a traffic study or addressing Meyer's point about the emptiness of S. Main Street on Sunday mornings.

71. The decision also did not explain why parking and traffic would be an issue for a church but not for other uses then permitted as of right, such as auditoriums, community centers, art galleries and museums.

72. The City Council's decision also noted as a consideration that Idaho law prohibits the sale of alcohol within 300 feet of a church or school without City Council approval. The City Council reasoned that although this issue was not a present concern, a future City Council might refuse to grant such approval.

73. The decision did not explain why this would be an issue, when schools, which are similarly situated with respect to the liquor license issue, were then permitted downtown as of right under the City Code.

74. In each section of its written decision, the City Council acknowledged the substantial public pressure to deny the application.

75. In the "findings of fact," the decision stated that the public was "heavily against" granting the CUP, "overwhelmingly . . . were opposed," and "did not think it was a good fit with the community."

76. As a "conclusion of law," the decision stated that "the great majority of the city residents and residents near this location oppose the granting of a CUP."

77. In the decision section, the decision states that "[t]he City of Troy welcomes any church to our community; however, the decision of the City Council is that the CUP application must be denied as the proposed use of the property for purposes of a church in the commercial zone of the City is against the will of the people and will have a negative effect on the City's ability

to grow its business community."

78. As discussed above, many of the public comments reflecting the "will of the people" are comments that demonstrate animus and discrimination against the Christ Church, its members, and their religious beliefs.

79. The decision did not discuss whether there were conditions that could be imposed on the church's operation to ameliorate any of the City Council's alleged concerns, and there is no indication that any such conditions were considered.

80. The City Council unanimously approved the written decision.

81. On April 14, 2023, Meyer appealed the City Council's denial of the CUP and informed the City Council that its decision was unlawful on several grounds, including under RLUIPA.

82. On May 31, 2023, the City Council held a public hearing in which the City's attorney addressed the public and explained, among other points, that he believed the City had not violated RLUIPA.

83. The City Council voted to deny the appeal.

84. Following the denial, the City threatened to bring an enforcement action to stop the church from operating at the Subject Property, however the City agreed not to take legal action against the church during the pendency of the United States' investigation.

85. Meyer and Christ Church had a reasonable expectation of receiving approval for the CUP application.

86. The reasons provided by the City for the denial do not implicate a compelling governmental interest.

87. Even if a compelling interest was implicated, the City has not sought to implement

the least restrictive means to address its purported concerns.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF RLUIPA'S EQUAL TERMS PROVISION

88. The allegations above are incorporated by reference.

89. The City acted in violation RLUIPA by "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

90. The City Code, on its face, and in the C-1 zoning district where the Subject Property is located, treats religious assembly uses on less than equal terms with nonreligious assemblies or institutions.

### COUNT II: VIOLATION OF RLUIPA'S SUBSTANTIAL BURDEN PROVISION

91. The allegations described above are incorporated by reference.

92. The City acted in violation of RLUIPA by "impos[ing] or implement[ing] a land use regulation that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," without demonstrating that the imposition of the burden "is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1)-(2).

93. Troy's denial of the CUP application imposed a substantial burden on Meyer's and Christ Church's religious exercise.

94. The substantial burden was imposed in the implementation of land use regulation or system of land use regulations under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

## COUNT III: VIOLATION OF RLUIPA'S NONDISCRIMINATION PROVISION

95. The allegations described above are incorporated by reference.

96. The City acted in violation of RLUIPA by "impos[ing] or implement[ing] a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

## PRAYER FOR RELIEF

**WHEREFORE,** the United States prays that this Court enter an order that:

A. Declares that Troy's policies and practices, as alleged herein, violate RLUIPA;

B. Enjoins Troy, its officers, employees, agents, successors, and all other persons in concert or participation with it, from:

   i. Imposing a substantial burden on the religious exercise of Meyer, Christ Church, and its members that is not narrowly tailored to further a compelling governmental interest;

   ii. Treating Christ Church and its members on less than equal terms with nonreligious assemblies or institutions; and

   iii. Discriminating against Christ Church or its members on the basis of religion or religious denomination.

C. Enjoins Troy, its officers, employees, agents, successors and all other persons in concert or participation with it, from enforcing the provisions of the City Code that treat religious assemblies or institutions on less than equal terms with nonreligious assemblies or institutions, including sections 9-9-2 and 9-12 *et seq.*;

D. Requires Troy, its officers, employees, agents, successors, and all other persons in concert or participation with it, to:

    i. Take such actions as may be necessary to restore, as nearly as practicable, Meyer, Christ Church, and its members to the position they would have been in but for Troy's unlawful conduct, including, but not limited to, granting such approvals necessary to allow Christ Church to use the Subject Property as a place of worship; and

    ii. Take such actions as may be necessary to prevent the recurrence of such unlawful conduct in the future, including, but not limited to:

1. Ensuring that religious assemblies or institutions are not treated on less than equal terms with nonreligious assemblies or institutions;
2. Ensuring that the religious exercise of religious assemblies or institutions is not subject to any substantial burden that is not narrowly tailored to further a compelling governmental interest;
3. Ensuring that religious assemblies or institutions are not discriminated against on the basis of religion or religious denomination;
4. Providing RLUIPA training to its personnel;
5. Establishing procedures to address complaints of RLUIPA violations; and
6. Maintaining records and submitting reports relating to RLUIPA compliance; and

E. Awards such other appropriate relief as the interests of justice require.

Dated: May 20, 2025

|  |  |
|---|---|
|  | Respectfully Submitted, |
| JUSTIN D. WHATCOTT<br>Acting United States Attorney | PAMELA BONDI<br>Attorney General |
|  | HARMEET K. DHILLON<br>Assistant Attorney General<br>Civil Rights Division |
|  | MICHAEL E. GATES<br>Deputy Assistant Attorney General<br>Civil Rights Division |
|  | CARRIE PAGNUCCO<br>Chief<br>Housing and Civil Enforcement Section |
| /s/ *Christine England*<br>CHRISTINE ENGLAND<br>Assistant United States Attorney<br>1290 W. Myrtle Street, Suite 500<br>Boise, ID 83702<br>Tel: (208)-334-1211<br>christine.england@usdoj.gov | /s/ *Noah D. Sacks*<br>AMIE S. MURPHY<br>Deputy Chief<br>NOAH D. SACKS<br>CALLIE BRUZZONE<br>Trial Attorneys<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>4 Constitution Square<br>150 M St., NE, Suite 800<br>Washington, D.C. 20530<br>Tel: (202) 957-1997<br>callie.bruzzone@usdoj.gov |
|  | Attorneys for Plaintiff United States of America |